## Jellico Coal Mining Company v. Morgan.

(Decided April 17, 1923.)

### Appeal from Whitley Circuit Court.

1. Master and Servant—Employe Shooting Guard Entitled to Notice of Employment of Guard.—Where an office employe of a mining company who had been given a key to the office returned at night and shot a guard mistaken for a burglar, the gift of the key licensed the employe to return, and the employer was under duty to notify the employe that a guard had been placed in the building to protect it against burglars, and to notify the guard of the situation if it was not deemed prudent to notify the employe of the guard's presence.

2. Master and Servant—Guard Mistaken for Burglar and Shot by Employe at Night Held Negligent in Failing to Ascertain Probability of Employe's Return.—An officer who was employed by a coal mining company to guard its building against burglars should have anticipated the possibility that some of the employes might return to the building at night and should have made inquiry with reference thereto from his employer, so that he cannot recover against employer for injuries received by him when an office employe, who had been given the office key but not warned of the guard's presence, did return and shot the guard mistaking him for a burglar.

TYE & SILER for appellant.

R. L. POPE for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

Appellant has a commissary at Mountain Ash, Ky. It is a two-story, rectangular building, facing the road on the south, with a one-story "lean to" on the east. From the rear wall for about one-half the length of the building there is no partition between the main part of the building and the "lean-to," there being windows along the eastern side lighting the store, but a partition runs between them from the front and turns at right angles to the eastern wall, thus forming an offset in the store and creating a side room in front. This, in turn, is divided by another partition. Of the two rooms thus formed the front is used as the general office of the company, and the second or the center is that of the manager. There are three doors to these offices. The first is the entrance in front, the second connecting the two offices

and the third straight back, entering the store proper through the rear partition, the entrance to the store being in the front.

Some time previous to the 21st of June, 1918, the store had been broken and entered on different occasions at an upstairs east window, just to the rear of the office.

Appellant's manager, Jack Taylor, employed the appellee to guard the building at night, he at the time being deputy sheriff of Whitley county.

Strict secrecy was exercised about the matter, and the appellee was received into the store from the side door after dark Friday evening, by an employe named Steiner. It does not appear that any of the other employes had notice of his presence or knew that the store was being guarded in any way or that he requested that such notice be given. He remained on guard during Friday night and was secreted on the upper floor during Saturday, his meals being carried to him. He came down some time after dark Saturday night and went on duty, there being no evidence that he was given any particular instructions as to his conduct, aside from the fact that he had been shown the window through which the former entrances had been effected. Ordinarily the third door leading from the rear of the office into the store building was kept locked, but either the key to this was given to the appellee or it was opened for his benefit, and he seems to have had the run of the entire building.

There was an ice cream festival Saturday evening at the church building about eighty yards to the east of the commissary, and quite a crowd gathered and remained there until near twelve o'clock.

Appellee at first went into the manager's office and sat on a chair between the rear door and the table, which occupied the center of the room. This position afforded a view of the window through which the former entrances were made and also the office windows. After the crowd at the church broke up he went back and stood at a point near the door, there being some boxes piled at the rear of the door and which formed a screen from the window.

While thus standing about one-thirty or two o'clock some one unlocked and entered the front door, came on through the second door, and approached the table in the second office, whereupon he threw a flashlight upon the intruder, who at the same instant presented a drawn pistol at him; appellee shut off the light and shouted, "Drop that gun." At that instant the intruder fired,

and they emptied their pistols at each other in the darkness, after which his assailant fled.

It further appears that appellant had in its employment a young man, 19 years of age, named Mauney, who was a stenographer, assistant paymaster and bookkeeper, but that his duties were confined to the two offices, and that he did not have a key to the rear door entering the store.

Mauney lived at Pleasant View, about one and one-half miles distant, and in anticipation of the ice cream festival had brought his clean clothes with him that morning and left them in a grip on the table in the manager's office.

He quit work that afternoon about five o'clock, going to the barber shop and afterwards returned to the commissary, changed his clothes and put his soiled clothes in the grip and went out about six o'clock.

He returned at seven o'clock to use the telephone and then went to the festival. At its close he accompanied a young lady home and returned to the commisary to get his grip, his intention being to return home that night. He unlocked the door and proceeded in the darkness through the second door and was reaching for his grip upon the table when a light was flashed upon him. The hands had been paid that day and some money left over in the safe. Mauney knew the combination of the safe and his first thought was that he was being held up by a burglar, who would try to force him to open the safe.

He shouted "Halt," and instantly presented his pistol. Morgan exclaimed, "Drop that pistol," whereupon Mauney fired and dropped under the table, and the shooting continued as above set out, Morgan being seriously wounded. Alleging that his injuries were caused by the negligence of the company, he sued it and recovered judgment for $1,000.00, and this appeal results.

The theory of appellant is that Morgan was employed for the express purpose of guarding the house, and thereby assumed all risks arising out of that hazardous employment; that as Mauney had no duties to perform after the store closed, and prior to this time had never been in the store later than 8:30 p. m., it could not reasonably anticipate that he would come as he did, and was under no duty to tell either him or Morgan of the employment and duties of the other.

Appellee takes the position that in accepting employment as guard he undertook to protect the store against

burglars, that his employer had no control over these and that he assumed all the risks to be encountered in dealing with them, but that the employer increased this risk by introducing an abnormal peril, not contemplated by the employment, viz., by permitting him to be mistaken for a burglar and shot by another servant whom the employer could have controlled; that this situation placed the latter under the duty of either informing Mauney of his presence or of giving him notice of Mauney's carrying a key to the store.

An unusual and interesting case is thus presented; indeed neither court nor counsel have discovered a similar one. It must be admitted that both theories are plausible and yet we cannot fully adopt either.

It is not claimed that there was any rule or direction for the employes not to return at night. The gift of the office key licensed Mauney in so doing; that he was not required to work at that time did not make him a trespasser, nor did the fact that he had not theretofore done so authorize the inference that he never would. His conduct in returning at this time was natural and reasonable and indicates what might have reasonably been anticipated, and it would seem entitled him to notice of Morgan's presence. Of course he may have been under suspicion of the housebreaking, or for other reasons it might not have been deemed prudent to notify him of Morgan's presence; in that event Morgan could have been informed of the situation and proper precautions taken.

As to Morgan the situation and the relation of the company were different. He undertook to guard the store, and was bound to know that there were clerks employed. It was a natural presumption that some of them carried keys and were licensees entering the store at their pleasure. Under such circumstances, if their presence should have been anticipated by the employer, the same forethought should have been exercised by him, and it was as much his duty to inquire of the employer in reference to them and arrange with him for their mutual protection, or to see them for that purpose himself, as it was for the employer to take such action.

In other words, while he did not know the names of the employes and possibly did not know their duties or habits, his knowledge of general conditions was similar to that of the employer, and he cannot complain of a failure upon the part of the latter to perform a duty for his protection, when he is in fault in the same matter,

and under these facts the court should have instructed the jury to find a verdict for the defendant.

Wherefore, judgment is reversed and cause remanded for proceedings consistent with this opinion.

Whole court sitting.

Chief Justice Sampson dissenting.