### MADISON et al. v. PHILLIPS PETROLEUM CO.*

No. 8041.

Circuit Court of Appeals, Fifth Circuit.

March 6, 1937.

Rehearing Denied April 16, 1937.

*Writ of certiorari denied 57 S.Ct. 946, 81 L.Ed. —.

HUTCHESON, Circuit Judge, dissenting.

———◆———

E. O. Northcutt, of Amarillo, Tex., for appellants.

E. H. Foster, of Amarillo, Tex., Don Emery, of Bartlesville, Okl., and R. K. Batten, of Shreveport, La., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

FOSTER, Circuit Judge.

This suit was brought under the provisions of article 4671, Texas Revised Civil Statutes, by the heirs of Alfred Abrams, individually and through their legal representatives, to recover damages for his death, the particulars as to which will hereafter appear, alleged to have been caused by the negligence of defendant. The only error assigned is to the direction of a verdict for defendant.

The record is voluminous, with much unnecessary repetition of testimony, but the material facts may be somewhat briefly stated, as follows: Defendant, Phillips Petroleum Company, is a corporation owning and operating an oil refinery in Hutchinson county, Tex. It suffered losses by the stealing of gasoline from its pipe lines. C. J.

Howard was a tax supervisor of the State Comptroller's Department. It was his duty to stop the stealing of gasoline, in order to prevent evasion of the state gasoline tax. Representatives of defendant agreed with Howard that defendant would pay the salary of an undercover man to assist in catching gasoline thieves. As a result of this agreement, H. J. Shadwick was employed in that capacity. Defendant paid over to Howard the stipulated salary of $200 a month. Howard in turn delivered it to Shadwick. Shadwick was entirely under the direction of Howard and was also used in investigating tax evasions not connected with defendant. He made no reports to defendant and received no instructions from its officers. Shadwick made a verbal agreement with Raymond Giersch to haul gasoline, to be taken from the pipe line of defendant, to be delivered as directed by Shadwick. The purpose of this was to establish that Shadwick was stealing gasoline, to enable him to make favorable contact with gasoline thieves. Giersch owned a truck and a sufficient number of barrels or drums. Shadwick was to pay an agreed price for each trip made. There was no agreement as to the amount of gasoline to be hauled and Shadwick was to give directions as to each trip. Giersch enlisted Alfred Abrams in the enterprise. Three trips were successfully made. On the first trip Shadwick went at night with Giersch in the truck to a point where a tap was in the pipe line of defendant. There they met another man, whom Shadwick introduced to Giersch, and told this man, whom Giersch remembered as "Homer," "this is the fellow I have got coming out here to work," and told Giersch the man was the foreman of defendant's plant. Giersch was instructed by Shadwick that if while he was out there the line walker came along, to drive off and leave him and not have anything to say to anybody, but, if he got him, to tell him to take him to the big boss and tell him why he was out there and that he (Shadwick) sent him; that, if he was stopped on the road by an officer, to pay the tax on the gasoline and he would reimburse him. Shadwick went with the truck on perhaps one other trip. He, on each trip, disposed of the gasoline and paid Giersch the agreed compensation for hauling it. The last trip was undertaken on the night of March 15, 1933. On this occasion Abrams was shot by the sheriff of the county or his deputies and so severely injured that he died shortly thereafter.

The testimony relevant to this occurrence, in substance, was this:

Howard testified that on the morning of March 15th Shadwick told him that there would be a number of trucks going to the tap on defendant's pipe line, for the purpose of stealing gasoline; that the first truck would get there early and the others much later; that if the first truck was loaded with barrels to not molest it and let it go. He agreed to this. (Shadwick's testimony corroborated this agreement.) Howard had an interview with the sheriff of the county and some of his deputies and arranged for them to go with him to the tap, for the purpose of arresting the gasoline thieves. He instructed the sheriff and the deputies that the first truck, if it was loaded with barrels, was not to be molested and that no shooting was to be done in making any arrest. The sheriff agreed to this. Howard, the sheriff, and six other men, four of whom were his deputies, one a highway patrolman, and the other an employee of the State Railroad Commission, went to the place about 7 or 7:30 in the evening and concealed themselves in the vicinity. Howard was with the sheriff and the other men were concealed at other points. The first truck came about 9 or 9:30 (this was the truck with Giersch and Abrams). Howard and the sheriff heard gasoline running into a barrel and drew nearer to ascertain whether the truck was loaded with barrels. They saw the truck begin to move off. Then Howard flashed his light, which was the signal to make an arrest. The sheriff called out to those on the truck to stop and fired his pistol in the air. Howard was armed but did not fire any shot. There were a number of other shots fired, he did not know how many, but presumed the deputies were also firing into the air. No other trucks came that night.

Giersch testified that he and Abrams went with their truck to the tap about 9 o'clock at night. The truck was loaded with twelve empty barrels, four on one side and eight on the other. It entered the road or path leading to the tap from the highway. It was then headed south. The four barrels on one side were filled with gasoline but it was necessary to turn the truck around to fill the other barrels, as the hose connecting with the tap was too short to reach the other barrels in that position. Giersch turned the truck around, and it was then headed north. Giersch then saw a light flashed and thought it was a

pipe line walker and started up his truck to go away. Abrams was standing on the side of the truck, bending over to get in. After he got the engine started, he looked around and saw Abrams lying on the ground. He stopped the truck and went to him and found that he was covered with blood. Giersch had heard no command to halt nor did he hear any shots as the engine was making so much noise. The sheriff then came up and arrested Giersch. When he made the agreement with Shadwick, he thought it was all right, but when they began hauling at night he thought there was something crooked in the business. He did not know the sheriff would be there that night but, if he had known it, that would have made no difference to him. There was no other testimony as to the killing or the events leading up to it.

■ The petition alleges that Giersch and Abrams were independent contractors but that is not conclusive. Had they been definitely employed to haul a stated quantity of gasoline or to make regular trips, without interference or direction by defendant, they might be considered such. The term "independent contractor" is very elastic and the true relationship depends upon the facts in each particular case. So, too, there is considerable doubt as to whether Shadwick was an employee of defendant. Mere payment of wages is not always enough to establish the relationship. Shadwick did not report to defendant and received no instructions from its officers as to how he was to do the work. His instructions came entirely from Howard. He might possibly be considered an independent contractor or an employee of the state of Texas. Labatt's Master and Servant (2d Ed.) §§ 18–19. However, as decisions of both of these questions depend on oral evidence, they present issues to be determined by the jury. We are considering the propriety of a directed verdict, so we will pass them without decision or further discussion.

■ The death created no presumption of negligence. It is not the absolute duty of the master to protect the servant against acts of third persons causing injury to him. St. Louis-S. F. Ry. Co. v. Mills, 271 U.S. 344, 46 S.Ct. 520, 70 L.Ed. 979; Atlantic Coast Line R. Co. v. Southwell, 275 U.S. 64, 48 S.Ct. 25, 72 L.Ed. 157; Fraser v. Chicago, R. I. & Pac. Ry. Co., 101 Kan. 122, 165 P. 831, L.R.A.1917F, 749, and note, 753.

Putting the case most strongly for plaintiffs, for the purpose of discussion, it may be assumed that Shadwick was the agent and vice principal of defendant; that defendant would be charged with any knowledge Shadwick might have of the danger involved in the employment of Abrams; and that defendant would be responsible for any negligence on the part of Shadwick in failing to warn Abrams of that danger.

■ It is the general rule that it is the duty of an employer to warn his employee of nonapparent danger attending the work. It is also the rule that the duty does not extend to warning the employee of danger of which the employer does not know and could not anticipate by the exercise of reasonable care. Burdick's Law of Torts (4th Ed.) § 167; Labatt's Master and Servant (2d Ed.) §§ 1142, 1143; Aqua System, Inc., v. Kodakoski (C.C.A.) 88 F.(2d) 395, decided March 4, 1937, and authorities therein cited.

■ It may be presumed that Shadwick knew that the sheriff and his deputies would be at the tap on defendant's pipe line when Giersch and Abrams went there to get a load of gasoline. But he had told Howard the truck would be there early and was not to be molested. Howard had acquiesced in this and had so instructed the sheriff and his deputies and had also instructed them there was to be no shooting. Shadwick was entitled to rely upon the presumption that sworn officers of the law would do their duty and would not use more force than necessary in effecting an arrest. Giersch knew that he was engaged in what would appear to be an unlawful transaction and that there was a possibility of his arrest. Under his instructions from Shadwick he had no reason to fear the consequences of an arrest. Notice to him of the presence of the sheriff was immaterial. Of course, he did not anticipate that the sheriff or his deputies would wantonly shoot at the truck but neither had Shadwick any reason to anticipate that result. Since Abrams was a full partner in the enterprise, it is a reasonable presumption that he had the same knowledge as Giersch. At any rate, as death has sealed his lips, there is no evidence to the contrary. However, that would not relieve plaintiffs of the burden of proving negligence. The jury would not be authorized to speculate as to what Abrams knew or did not know or as to what he would have done had he

been informed the sheriff would be at the tap.

■ The object of the warning is to permit the person warned to take precautions to avoid the danger. The mere presence of the officers at the scene of the tragedy was not the danger to be apprehended. We do not consider that, in the exercise of reasonable care, defendant and its agents should have anticipated the officers would shoot at and injure Abrams and should have warned him of that. Failure to give such warning was not the proximate cause of Abrams' death. Negligence on the part of defendant was not shown. It was not error to direct a verdict for defendant.

Affirmed.

SIBLEY, Circuit Judge (concurring).

I concur in the opinion, adding this: Giersch testified: "We were assisting Shadwick in apprehending and catching gasoline thieves. I knew that after I started the first trip"; and touching the fatal night he said: "Shadwick told me he wanted me to be there at nine o'clock because there was going to be some gasoline thieves out there that evening and he wanted us there first. * * * I presumed that gasoline thieves were going to be there. * * * I figured somebody would catch them. I did not think anything about officers of the law, I would not have cared who it was. Ordinarily officers arrest people and I figured these people would be arrested that night. * * * It was true I did expect officers out there at that tap that night." I do not see how a jury could reasonably conclude that Giersch's partner in the hauling, Abrams, knew less or "figured" differently. What nobody knew or expected was that the officers would shoot without reason or necessity.

HUTCHESON, Circuit Judge (dissenting).

My difference with my associates is on a point, narrow indeed but most substantial. It is the difficult one of whether the evidence tends to prove that defendant failed in its duty to warn deceased of the conditions surrounding and the dangers attending his enterprise on the night in question, and that such failure in law proximately contributed to his death. The divergence in view on the point is already thrown into definite outline. by the two opinions of my associates. A few words from me will, I believe, serve, while more sharply defining

it, to point at once to the basis of, and the reason for, this divergence. My associates recognize that defendant was under a duty to warn deceased of dangers known to or in the exercise of reasonable care knowable by it but unknown to the deceased. They recognize, too, that for breach of this duty proximately causing injury the defendant would be liable. The main opinion goes on the theory that the danger to deceased arose out of the wholly unwarranted and unexpected act of the officers in shooting him, an act, they say, which the defendant in the exercise of reasonable care could not have anticipated. It goes too, on the ground that, the failure to warn deceased of the presence of the officers was not a proximate cause of the injury, that those in the car heard no commands to stop, and therefore would have acted no differently than they did act if they had known the officers were to be there. The concurring opinion goes on a different ground. It asserts that the failure to give specific warning was not material because the proof shows that the deceased knew independently that officers would be there.

I can not agree with either of these views. I think it quite plain that the peculiar circumstances of deceased's employment and of the activities in which he was engaged made it imperative that he be fully advised of the particular conditions and dangers attending their discharge. Defendants may not, I think, excuse its failure to fully advise him that officers would be there in force that night by the claim that, under all the circumstances, as matter not of fact but of law he must have known they would be. I cannot agree, either, that the unexpected shooting and not the failure to warn him that officers would be there that night to catch thieves was in law the responsible cause of his death. For while it is true that the officers apparently lost their heads and shot deceased without orders, it is also true that the circumstances of the trap and ambuscade made a very dangerous situation on these premises, and that if there was an attempt at flight some shooting might reasonably have been expected. As to these matters deceased should have been fully warned. The fact, if true, and whether it was true would be for the jury, that deceased's companion did not hear the commands to halt his car or any of the shots does not establish as matter of law either that deceased did not hear them or that the failure to warn was not the proximate cause of their not having been heard. For,

had they been advised that the officers would be there, they would have been looking out for such commands and would have stopped the car and otherwise acted accordingly. The authorities make it clear that under the circumstances a duty of warning arose. Armstrong Co. v. Adair, 112 Tex. 439, 247 S.W. 848; Lipscomb v. Houston & T. C. Ry. Co., 95 Tex. 5, 64 S.W. 923, 55 L.R.A. 869, 93 Am.St.Rep. 804; Jellico Coal Mining Co. v. Morgan, 198 Ky. 635, 249 S.W. 780; Collins v. Pecos & N. T. Ry. Co., 110 Tex. 577, 212 S.W. 477, 222 S.W. 156.

I think it was for the jury to say whether the duty was insufficiently discharged and whether this was a proximate cause of the injury. I dissent.

On Petition for Rehearing.

PER CURIAM.

As neither of the judges who concurred in the judgment of the court in the above numbered and entitled cause is of opinion that the petition for rehearing should be granted, it is ordered that the said petition be and the same hereby is denied.