## SHREVEPORT LAUNDRIES, Inc. v. UNITED STATES.

### Civ. A. No. 2388.

United States District Court
W. D. Louisiana, Shreveport Division.

May 31, 1949.

Blanchard, Goldstein, Walker & O'Quin, Shreveport, Louisiana and Elias Goldstein and John A. Dykes, Shreveport, Louisiana, of counsel, for plaintiff.

Theron Lamar Caudle, Assistant Attorney General, Andrew D. Sharpe and John P. Wenchel, II, Special Assistants to the Attorney General, and Malcolm E. Lafargue, United States Attorney, of Shreveport, Louisiana, William J. Fleniken, Assistant United States Attorney, of Shreveport, Louisiana, for defendant.

PORTERIE, District Judge.

This is an action for the refund of amounts paid under the Federal Insurance Contributions Act, 26 U.S.C. §§ 1400–1432, 26 U.S.C.A. §§ 1400–1432; and the Federal Unemployment Tax Act, 26 U.S.C. §§ 1600–1611, 26 U.S.C.A. §§ 1600–1611, with respect to the remuneration of one Gus A. Migurski, deceased, and his widow, Mrs. Martha Alice Migurski.

On August 5, 6, and 11, and September 2, 1947, the Collector of Internal Revenue levied deficiency assessments against petitioner for Social Security taxes allegedly due under the two acts upon remuneration received by Mr. and Mrs. Migurski. The amounts of the assessments were paid under protest, claims for refund were filed and were all disallowed on March 16, 1948, and this suit was subsequently instituted to recover the amounts paid.

Petitioner contends that Mr. and Mrs. Migurski were not employees during the period for which taxes were collected.

The only issue before the court, therefore, is whether or not Gus A. Migurski and Martha Alice Migurski were employees of Shreveport Laundries, Inc. during the period for which the taxes were collected, i. e., April 1, 1942, through December 31, 1945, under the Federal Insurance Contributions Act, and the years 1942 through 1945 under the Federal Unemployment Tax Act.

Expressed in narrative form, the evidence shows that the following relationship existed between Shreveport Laundries, Inc., and Mr. and Mrs. Migurski. Sometime before 1937, Mr. Migurski was employed by Shreveport Laundries, Inc., to take over the operation of two call stations, one being the Cash & Carry Station located at 1173 Louisiana Avenue, and the other being the Cash & Carry Station located in the Medical Arts Building, both located in Shreveport, Louisiana. In actual operation, Mr. Migurski managed the Medical Arts Station and Mrs. Migurski managed the Louisiana Avenue office. Mr. Migurski was paid a commission on all work handled by Shreveport Laundries, Inc., from these two stations of either 15% or 20%. Under this original arrangement, the laundry furnished transportation for the pick-up and delivery of work, the laundry paid the rent on both stations, the hours of opening and closing were fixed by the laundry, periodic checks and inspections were made of the two stations by the laundry employees, and, in general, Mr. and Mrs. Migurski were treated as employees of the laundry.

Then, in September of 1937, the management of the Medical Arts Building raised the rent on that station. The officials of Shreveport Laundries, Inc., decided that it would not be economical to continue operating the station at the increased rent and decided to close the station, and Migurski was so informed. Migurski then proposed to take over the operations and the laundry agreed to this proposal and increased his commission to 30%. From September, 1937, until his death, Migurski operated the two stations under the new agreement. Migurski furnished his own transportation; he extended credit at his own risk; he set his own hours of opening and closing; he was responsible for losses which occurred through negligence at the two stations; he and his wife freely employed persons to help them at the two stations; he reimbursed Shreveport Laundries, Inc., for the rent on both stations; and, was generally allowed full and complete discretion in all of the details of operation of the two stations. The only subsequent change made in this relationship was with regard to the payment of rent. After Migurski took over the two stations, the bookkeeping department of Shreveport Laundries, Inc., continued to make Social Security deductions and in June of 1938, Migurski went to the office of Shreveport Laundries, Inc., and demanded that they stop making these deductions for the reason that he was not an employee. The deductions were stopped forthwith and were not made from that time until the time of Migurski's death.

## Control

The testimony clearly shows that Shreveport Laundries, Inc., did not retain that degree of control which is indicative of an employer-employee relationship. Migurski was not subject to supervision as to hours of business as were the employees who operated the regular laundry call sta-

tions. He was under no supervision as to the extension of credit and all credit was granted by him solely at his own risk. He was not required to pick-up or leave laundry at specific times and in fact delivered laundry at any time he desired. He was allowed to change the name of the Medical Arts Station. In addition, Migurski was not required to make the detailed accounting required of regular employees.

### Control of Migurski's Servants

The testimony shows that prior to 1937, Migurski was not authorized or allowed to have employees other than himself and his wife at the two stations and that, in fact, had no employees. On the other hand, it was shown that during 1942 through 1945, Migurski and his wife employed assistants at both stations. These employees were paid directly by the Migurskis; no reports on them were submitted to the laundry; Social Security deductions were made on their employees by Mrs. Migurski; and, in fact, the officials of the laundry did not know either the number or the identity of the persons working for the Migurskis.

### Control of Premises

The testimony shows that after 1937 Migurski was personally responsible for the rent on both stations. Shreveport Laundries, Inc., continued to pay the rent at Medical Arts until sometime in 1942 for the reason that the managers of the building were not willing to accept Migurski as a responsible party. After October of 1942, however, arrangements were made directly between Migurski and the manager of Medical Arts and from that time the rent was paid directly by Migurski. Shreveport Laundries, Inc., continued to pay the rent on the Louisiana Avenue Station after 1937 because they were the owners of the building on the leased premises. However, when the rent was raised by $5.00 per month, this additional rent was paid directly to the lessors by either Mr. or Mrs. Migurski. Furthermore, and unlike the operators of the regular stations, the Migurskis paid the utilities on both stations after 1937. The Migurskis were the tenants of the two stations during the entire period from 1942 through 1945 and presumably had the right to do as they wished. It will be noted from Mrs. Mi-

gurski's statement that repairs became necessary on the Louisiana Avenue Station during this period and that the Migurskis themselves were required to make these repairs.

### Mode and Method of Payment

Unlike the regular employees of the laundry, Migurski was not required to furnish a detailed accounting each week. Migurski's remuneration depended solely upon the amount of laundry and cleaning which he turned in. There was no guaranteed minimum remuneration whatsoever, as in the case with regular laundry station operators. Furthermore, Migurski's settlements were on a cash basis in that he was not credited for charge accounts of customers and although the operators of the regular laundry stations could extend credit to any of the approved customers of the laundry, Migurski extended credit solely at his own risk.

### Furnishing Supplies and Equipment

The laundry furnished certain string, wrapping paper and tickets; but aside from the negligible value of these materials, these items were furnished solely as a matter of convenience to the laundry and not to Migurski. It also was shown that certain racks and shelves belonging to the laundry were on the premises, having a total value of only approximately $50.00. These items of equipment were on the premises at the time Migurski took over and it would not have been worth the time and trouble required to remove them, even had the laundry desired to do so. The total value of all of this is small when compared with the total rent of the premises paid by Migurski, which is the equivalent of furnishing the value of the premises which would go to hundreds and likely thousands of dollars.

Migurski furnished an automobile with which to transport the laundry. As previously stated, the laundry itself furnished transportation for all of its regular stations and had furnished transportation for Migurski prior to the time he took over the operation of these stations.

### Termination of Relationship

There is evidence in the record to the effect that the relationship could have been

terminated on short notice. This would necessarily result from the fact that the two stations were held by virtue of month-to-month leases and neither party could be assured that the arrangement would continue for any given period of time.

### Additional Factors Showing the Intention of the Parties

1. The testimony definitely establishes that the intention of *both* parties to the contract was that Migurski should be an independent contractor. It is highly significant that it was at *Migurski's own request* that Social Security deductions were stopped. And the testimony of Mr. Goldstein and of Mrs. Schwartzenburg establishes that the laundry intended that Migurski be completely independent.

2. A good example of Migurski's independence lies in the fact that he was allowed to be around the laundry premises when he had been drinking intoxicating liquor.

3. Another instance of the different treatment accorded Migurski is the fact that the laundry officials accepted several thousand dollars worth of bad checks which had been passed on Migurski. It is not reasonable to assume that the laundry would have accepted checks in such numbers and amounts from one of its regular station operators.

4. Finally, it was shown that losses incurred through negligence at the two stations fell on Migurski, whereas, such losses were borne by the laundry in similar instances at their regular stations.

### Mrs. Migurski's Deposition

In our findings of fact herein we have disregarded the testimony of Mrs. Migurski in some of its phases. There is no reflection on her integrity; she did not know of the legal relationships, because her husband attended to the contracts.

Examples of this want of correct information will be found in that she stated categorically that the original commission paid Migurski was 40% and that it was subsequently reduced to 35% and that this latter rate was what her husband received until his death. It goes without question, however, that the original commission was 15% or 20% and that under the new arrangement, which is the period of time at issue in the instant case, the commission was raised to 30%. Incidentally, this higher pay is a circumstance in favor of establishing the quality of Migurski as an independent contractor.

Mrs. Migurski unqualifiedly said she had never received one (1¢) cent in settlement of her husband's bond account. The contrary proved in the record is that such a settlement was made, and the canceled check bearing Mrs. Migurski's endorsement in specific settlement of Migurski's bond account is offered.

She likewise testified in her deposition that she always made her own settlement with Shreveport Laundries, Inc., for the station she supervised, but the evidence preponderates the other way to the effect that the settlement sheets were always attended to by, and made in the name of, Mr. Migurski.

There is also irreconcilable variance on other points, to wit: as to whether or not there were assistants at the Medical Arts Station; as to hours of work per day; and as to number of days worked per week at the two stations. On this latter point, the total number of hours per week for the similar hours per week for the laundries would show a serious violation of the state law on the subject.

So, all in all, we, in good conscience, had to disregard many items of this lady's testimony.

### Legal Discussion

The dominant source of the law to apply in this case is found in the Internal Revenue Code and Treasury Regulations promulgated thereunder, defining "employees".

Section 1426(d) of the Internal Revenue Code, 26 U.S.C.A. § 1426(d), provides as follows:

"§ 1426. Definitions

"When used in this subchapter—

　*　　*　　*　　*　　*　　＊

"(d) Employee. The term 'employee' includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-

employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."

Section 1607(i) of the Internal Revenue Code, 26 U.S.C.A. § 1607(i), provides substantially the same as does Section 1426(d).

Treasury Regulations 106, promulgated under the Federal Insurance Contributions Act, provides as follows:

"Sec. 402.204. *Who are employees.*— Every individual is an employee if the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

"Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to *what* shall be done but *how* it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee.

"Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

"Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

"If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, or independent contractor.

"The measurement, method, or designation of compensation is also immaterial, if the relationship of employer and employee in fact exists.

"No distinction is made between classes or grades of employees. Thus, superintendents, managers, and other superior employees are employees. An officer of a corporation is an employee of the corporation but a director as such is not. A director may be an employee of the corporation, however, if he performs services for the corporation other than those required by attendance at and participation in meetings of the board of directors.

"Although an individual may be an employee under this section, his services may be of such a nature, or performed under such circumstances, as not to constitute employment within the meaning of the Act."

Section 403.204 of Treasury Regulations 107, promulgated under the Federal Unemployment Tax Act, is substantially the same as Treasury Regulations 106, Section 402.204, as set out above.

It is to these two sections that we have brought all of the facts of the instant case for measure and consideration.

█ It has been mutually agreed that the laws of the state of Louisiana are not applicable; the common-law cases as developed in construing the Federal Insurance Contributions Act and the Federal Unemployment Tax Act are to be applied.

█ It would seem that of the number of factors that determine whether or not the employer-employee relationship exists, no particular one is controlling and each

case must be determined on its own facts. Madison et al. v. Phillips Petroleum Co., 5 Cir., 1937, 88 F.2d 515; Cimorelli v. New York Cent. R. Co., 6 Cir., 1945, 148 F.2d 575.

We have read the two most important cases on the phase of the right to control the mode and manner of doing the work: Glenn, Collector of Internal Revenue, v. Beard, 6 Cir., 141 F.2d 376; Blankenship et al. v. Western Union Tel. Co., 4 Cir., 1947, 161 F.2d 168.

■ It has been generally held and accepted that if the one hired is subject to the control of the hirer as to the means, method, and details of performance, he is said to be an employee, whereas, if he is subject to control only as to the *result* to be accomplished, and the mode and manner of performance are matters of his own discretion, he is an independent contractor. Treasury Regulations, Sec. 402.204, 403.-204; Vaughan et al. v. Warner et al., 3 Cir., 1946, 157 F.2d 26; 56 C.J.S., Master and Servant, § 3(3), page 49.

The Regulations and the decisions of the courts uniformly stress the importance of the phase of control. Radio City Music Hall Corporation v. United States, 2 Cir., 1943, 135 F.2d 715; Glenn, Collector of Internal Revenue, v. Beard, 6 Cir., 1944, 141 F.2d 376.

In the case of United States v. Silk et al., 1947, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757, it was held that the term "employee" should be given liberal interpretation. The reasons therefor are: (a) The underlying purpose of adjusting the tax sections and the benefit sections of the Social Security Act, 42 U.S.C.A. § 301 et seq., is for the protection of beneficiaries thereunder from some of the hardships of existence; and, (b) Social Security legislation should follow the rule applied to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., whereby "employee" is construed in the light of the mischief to be corrected and the end to be attained, and technical concepts such as "power of control," pertinent to employer's responsibility for servants' act, are rejected.

The above was elaborated in the case of Bartels et al. v. Birmingham et al., 1947, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947, 172 A.L.R. 317.

However, in November, 1947, after the above pronouncements by the Supreme Court, in the above two cases, is when the Congress passed Section 1607(i) and Section 1426(d) of the Internal Revenue Code, stressing: "any individual who, under the *usual common-law rules* applicable in determining the employer-employee relationship, has the status of an independent contractor". Emphasis ours.

In our decision of this case we are not considering that the passage by Congress of these two sections of the Internal Revenue Code subsequent in time to the two above-quoted decisions is a rejection of the doctrine of the Supreme Court established in the two cases. We shall decide this case by applying the principle of liberality in naming the character of legal relationship existing, whether it be that of employer-employee or that of independent contractor.

■ In applying the above law, using the sections, as we have given them, we believe that during the period involved in this case Migurski was an independent contractor.

It is true that he did none of the laundry work; the laundry work was solely the job of the taxpayer. However, when the relationship between the two parties was changed and Migurski paid the rent of the place, owned his own truck, and hauled the received laundry from his place to the laundry house of the taxpayer, when Migurski hired and paid himself whomever he pleased and at whatever price and for whatever periods he desired, when he fixed his own hours of work, when he paid the cost of all utilities, and also made repairs at his own cost to the premises, when, under the new arrangement, he was not required to furnish a detailed account each week, and there was no guaranteed remuneration promised him, and when, additionally, he extended credit solely at his own risk, when formerly it was different, he became an independent contractor—not on the phase of laundering the clothes or cleaning the clothes, but because the means, methods, and details of his job were under

his own discretion and control, unmolested by the taxpayer. Then the taxpayer was merely interested in the results to be accomplished and that result was the reception by it of bags of laundry and bundles of suits to be cleaned.

We believe the Treasury Regulations, cited above, and the cases cited above, will support us in our conclusion.

On the additional test as to whether or not the employer has control of servants of the purported employee, see, Kentucky Cottage Industries, Inc., v. Glenn, Collector of Internal Revenue, D.C.1941, 39 F.Supp. 642.

"The fact that the contractor employs, pays, and has full power to control the workmen is virtually decisive of his indepedence, and the fact that he does not have the control of the workmen is entitled to consideration as showing his lack of independence." 27 Am.Jur. 492, § 11.

Judgment will be signed in accordance with the above opinion, granting relief as prayed for by the complainant, Shreveport Laundries, Inc.